Thank you. Good morning. May it please the court. It's an honor to be here before you today and an honor to be here on behalf of the six appellant plaintiffs in this matter. It involves a question of taxpayer standing, which Can you put that mic a little closer? I want to make sure I hear you. All right, and I can speak a little louder as well. Yes, that would help me. So the issue here is whether we have, my clients have standing as taxpayers to bring this challenge to Senate Bill 2, which was passed in response to this court's ruling in Boston, allowing and recognizing same-sex marriages under the 14th Amendment. The state passed a law that allowed magistrates who are Article VI sworn judges to recuse themselves from that 14th Amendment obligation on religious grounds. And we filed a lawsuit challenging that under the First Amendment and other provisions as well. The district court ruled that we did not have standing as taxpayers, but there are two simple sort of elements of taxpayer standing. One is that you challenge a legislative enactment that spends money and that spending is somehow limited by the Establishment Clause. And both of those components are present in this case. First, the spending. The Attorney General admits in their brief that under this law, there is spending under this case, under this statute, and there are parts of it. One is that when, as happened here, all magistrates in one county recuse themselves from marriage, the Director of the Administrative Office of the Courts has to move a magistrate from another county into that county and do a swap, basically, to perform marriages in that county, under state law. So does it make a difference that that's expenditure of the judicial component of the government as opposed to a legislative appropriation? Well, it is a legislative appropriation. It's a legislative appropriation to the judicial division of their budget for the year and a directive that they use a portion of that budget to comply with this edict, that they move people across lines. And under 138-6 of the general statutes, as a matter of law, moving someone across state line requires that that employee be reimbursed for that expense. So it's a legislatively mandated expense. But it's not a direct appropriation for religious purposes. Isn't that a distinction? That's a distinction, but if you look at Marsh v. Chambers, which we alerted the court to in the last couple of weeks, there was no direct appropriation in that case. That was funding used out of an annual general budget of the state legislature in Nebraska to hire the chaplain to do the daily invocation. Three hundred and something dollars a month. It was a very small amount of money out of a general budget. The concern I have is that the Supreme Court has been really restrictive of taxpayer standing. I mean, you have Flask v. Coyne, and then it does seem to me that every subsequent opportunity the Supreme Court has had to narrow Flask v. Coyne and cut back on it, it's done now. Actually, I don't think that's true, Your Honor, if you look at it this way. It's not so much that it cut back on it, it's that they just said that these are the two requirements that you have. There has to be a challenge to a legislative enactment that implicates the Establishment Clause. The cases that it's narrowed are ones that didn't fit within that framework. Well, it would be fair to say that the Supreme Court has been very skeptical of taxpayer standing. Let me put it to you this way. What I think underlies some of the skepticism is the fact that there's no injury in fact in the classic sense. And as I understand it here, the plaintiffs are married, or there at least is no – they can get married. There's no impediment to their being married. So in this kind of situation, you would expect that the classic injury in fact is someone who is not married, wants to get married, and is forbidden to do so by state law. And that would be a classic case for standing and challenging it. Under the 14th Amendment. Yes, but under – And that's what we just went through that led to Obergefell. I understand, but injury in fact is a requirement of standing across the board. It doesn't just hop around from amendment to amendment. But the taxpayer standing has since last been the exception to that. And the interesting piece in Wynne, which was the Arizona case about the tax, the tuition credits, or the tax credits, is this very distinct language that the violation for the First Amendment is the extraction of tax money and spending it for a religious purpose. And in Wynne, there was no extraction because it was a tax credit. And it doesn't matter if the extraction is very small. That's that three-pence language that goes from Rutledge, Descent, and Everson up through Flask, and Kuno, and Hine, and Wynne. They're all there repeating that. I think that part of the difficulty exists on both ends. That there's not a classic injury in fact. You have to get an injury in fact, you have to go through taxpayer standing. Right. And then on the other end, where we consider the nexus between the two, there's not a classic constitutional violation. In other words, the classic constitutional violation here, I think, would be a legislative expenditure of funds to a particular church, or a benefit to a particular church, or an expenditure of funds for parochial schools, or what have you. I mean, so that's the problem here. And that is that there's no classic injury in fact. And then on the other end of the scale, there's no classic establishment clause violation in the sense of a legislative appropriation that benefits a particular religious faith. Those are classic establishment clauses. But that is present. Violation. So you see that they're... All I'm saying, I just want you to understand, I think... I understand where you're coming from. Let me respond. It's not a question of how one feels about same-sex marriage. I don't see that as being part of this. I think it's just a question of whether this fits within injury in fact, and whether it fits within what the establishment clause is normally expected to forbid. And if you look at the language of Wynne, Wynne is a pretty recent case in terms of taxpayer spending. It is. And Wynne says, but what matters under FLAST is whether sectarian STOs in that case receive government funds withdrawn from general tax revenues so that the monies have been extracted from the citizen and handed to a religious institution in violation of the citizen's conscience. And you don't have that classic setup here. You have the money going to a very legitimate entity, the judicial branch, to administer its workings. Now, I agree with you. I mean, I absolutely and in total sympathy with why you're objecting to this practice. Totally sympathize. But it seems to me that what the Supreme Court is saying is that for a taxpayer to make this argument, as opposed to somebody who couldn't get married, that it's got to flow directly out of the hands of the citizen into the hands of the religious entity. That's the classic First Amendment, as you say. But under Everson, it's any spending in aid of religion. Not in aid of a religious institution, but in aid of religion. And here, there is a religious belief, a rejection of this 14th Amendment principle. But there isn't an appropriation in aid of religion. There is. There's the specific directive that you must spend money out of your budget to pay the employee and employer retirement. Where is the directive located that you must spend money out of your budget? Where is that? Well, in Part 5, it's that the judicial department has to... It doesn't say anything about money. It just says it shall insure. And pay the employee and employer share of the retirement contribution for the period of time. That's a directive to pay money. And then, I mean, what we're talking about here is sort of a way to do an end run around the First Amendment, is that you know that if you order the administrative office of the courts to move people across state lines to protect this religious assertion that you don't have to uphold the 14th Amendment, which is the core of this for us, Your Honor. But do it, if I may. What I'm concerned about is my bosses, the court upstairs, and where they're going with this. And when I look at it, they are really restricting taxpayer standing. And Wynne is a good example of that. And on the other hand, this Supreme Court is very sympathetic to claims of religious conscience. And they're likely, because I have to look closely at what their decisions are, because I really want to follow them. And they're likely to look at this as an attempt to vindicate both the right of people to have, enter into a same-sex marriage by actually subsidizing the travel of a magistrate to perform that marriage. In other words, it's going to be looked at as an attempt to facilitate same-sex marriage and at the same time to accommodate claims of religious conscience. And so you have this... Your Honor, have you read...  I'm sorry. Apologize. You have this, what seems at least facially, an attempt to accommodate two very important rights. One, the right to a same-sex marriage, and the other right to freedom of religious conscience. If we look like we're receptive to challenges to that kind of arrangement, that's just not going to be viewed happily in the part of the highest court in the land. They're not going to be happy. Well, the first thing that the Supreme Court's going to do, Your Honor, is look at the language of the legislation. And the language of the legislation says nothing about accommodation. It is only about giving a right to religious objection to conducting marriages. It says nothing about accommodating the right of people to have marriages. So what you're doing is reading in an attempt to accommodate into statute that says nothing of the... Well, how long is it going to take the travel expense of a magistrate to perform the marriage and say that that magistrate would not be... But why isn't the travel expense and the reimbursement, why isn't the reimbursement an attempt to actually have a magistrate in the venue preferred by those that wish to become married in their venue? You know, they're not saying, oh, go somewhere else. We're not going to do it here. I don't understand them to be saying that. They're saying we're going to bring the facility, the ability to get married where you want to be married because we understand that getting a marriage license in a particular place is important and to force people to go elsewhere is discriminatory and forces them to have a marriage license in a place that they don't prefer. That would be a rank 14th Amendment violation if it was structured that way. That's why they structure it this way, to protect this religious objection to the court's ruling. That's what this... But there is also language to accommodate the right to marry because it says the chief district judge shall ensure that all individuals issued a marriage license seeking to be married before a magistrate may marry. So the balance in the case, the accommodation in the case is a fact question as to whether the balancing of that interest of the right of the people to 14th Amendment right to marry against the right of magistrates to disavow their oaths to uphold the Constitution. The person is being moved to protect that right, that exemption from the oath of office. That's the allegation in the case. And that this money is being used to facilitate and accomplish that violation that religion trumps the judicial oath under Article VI to uphold the Constitution. And that's a fact intensive as applied a question as to whether there, if there's an accommodation, whether it was even considered in the way that we're talking about. But that's what we want to have a trial about. And we think that we can show that money has been spent. And this is the holding and when, Your Honor, the one that Judge Keenan, that you said. But look at this one at page 563, 142. A dissenter to paint, at 142, a dissenter whose tax dollars are extracted and spent, knows she has spent in small measure, even in small measure, has made to contribute to an establishment in violation of conscience. Even if the conscientious dissenter's tax liability were unaffected and reduced even. And then this is where the, this is the First Amendment spending issue in the case under when. When government collects and spends taxpayer money, a subsidy of religion, a religious activity for purposes of flask is traceable to the government's expenditures. So we have government expenditure that we've alleged and that we can show that has the purpose of accomplishing this religious exemption that our clients find abhorrent to their religious beliefs. And that's the public spending issue in this case. Not whether it went to an institution, but whether the state is taking a position in a religious matter. It's in many ways an endorsement kind of case under Justice O'Connor's issue, which we haven't gotten into. But that's the basis. Thank you. I want to thank you very much. And we will now hear from Mr. Brito. Yes. Olga Vysotskaya may please the court. I represent the Attorney Judge Marion Warren. I want to get into the main argument by the plaintiffs in this case. The argument that Flask versus Cohen gives a taxpayer spending to these plaintiffs. Flask versus Cohen does not apply here for four distinct reasons. And I believe that judges touched upon all of these reasons in a different manner throughout the previous argument. I wanted to highlight them for the court. First, Senate Bill 2 is not a taxing and spending statute. North Carolina legislature did not promulgate Senate Bill 2 pursuant to its fiscal powers. Instead, it promulgated that statute under its powers to regulate the marriage authority of the magistrates. This will mean that plaintiffs will fail the first prong of Flask test. Second, even if some spending does occur as a result of Senate Bill 2, that spending is incidental to the central regulatory purpose of Senate Bill 2. The purpose of Senate Bill 2, as Judge Keenan and also Judge Thacker noted, is to ensure that those magistrates who object to the marriage, as defined by recent Supreme Court cases, that they have a religious accommodation. And ensures that all magistrates could get a religious accommodation to their marriage duties. But also at the same time... But should religion be able to trump the judicial obligation to uphold the Constitution as your opponent argues this would do? It should not, and this is not what Senate Bill 2 does. It's not about what, I'm sorry? It is not. It should not trump the oaths of the office, but that's not what Senate Bill 2... This is an end around, isn't it an attempt to avoid their duty to perform the obligations attendant to their job? That is not the duty under the current statute under Senate Bill 2. Well, because it now allocates the responsibility collectively, but... And that is perfectly within the North Carolina Legislature's authority to allocate those duties to the magistrates collectively rather than to the magistrates individually. That way... What does allocating something collectively mean? That in other words... Does it mean whenever you're called upon to perform a marriage ceremony that you do it? No, Your Honor. Okay, what does collectively mean? Yes, under Senate Bill 2 what it means is that instead of each individual magistrate being required to perform marriages, magistrate within a county or within a district would be given that responsibility. That's what it means. It does not mean kind of a discrimination that you discussed a few seconds ago. How far are the individuals traveling? I mean, as a general matter, are you able to get someone to perform the marriage in a neighboring jurisdiction or county or what? How is this working out in practice? And how often does this occur? How often is there an objection? So currently we are limited by the allegations in the complaint. And the one specific instance that plaintiff cited in the complaint was a magistrate in McDowell County where according to plaintiff's allegations all the magistrates recused themselves. And from a neighboring country, a county, Ruthford County, they had to bring a magistrate to perform marriages. How many magistrates were there in McDowell County that recused themselves that are there typically? Your Honor, I'm not sure how many to my knowledge. And it does not appear in the record. It's no longer the case. But we have to go by what plaintiff alleged in the complaint. And the allegations there is that in McDowell County all the magistrates recused themselves and they had to bring a magistrate from the neighboring county. What if in the Roman Catholic Church, and I was raised to serve a Catholic, the Catholic Church says that you can't divorce and then remarry unless you get an annulment from the Pope. So that if I am a Catholic magistrate, then I would be able to refuse to marry anybody who's been divorced in a civil proceeding and had not obtained an annulment. So let's say 15% of the people in the state fit into that category. So you'd be required to shuffle magistrates all around. I mean, if the magistrate, let's say half your magistrates were Catholic. Now maybe that's not true in North Carolina, you know, as it might be in Maryland. But let's just say, you know, 10% of your magistrates were Catholic, a lot of them. You'd be required to shuffle these people all around. You'd be spending a lot of money, wouldn't you? So it's my understanding it's Southern Baptists in North Carolina that predominate. However, that's not what Senate Bill 2 does. Senate Bill 2 does not allow magistrates to recuse themselves on the spot for any particular belief. What it allows magistrates to do is to recuse themselves for any objection to marriage. And it's not the state's business to inquire what that objection is. The only— So it doesn't have to be a sincerely held religious belief you're saying? It can be anything. The only thing that the statute requires is that it is a sincerely held religious belief. Yeah, I thought the statute required a sincerely held religious belief. That's exactly what it does require. What it does not require magistrates to do is to describe their belief or to qualify the depths of their belief. It just allows magistrates to take a recusal. So if my religion doesn't believe in interracial marriage, then the judicial department would be required to— who didn't believe in interracial marriage because of their religious belief, then they'd be shuffling people all over the state to perform ceremonies, the people who were willing to marry interracial couples. You see what I'm saying? It's not just going to— The potential in this is for massive expenditure of funds if you're talking about the particular belief. Now, there may be only a few people who won't marry same-sex couples. I don't know. But, I mean, there are just so many different beliefs that are rounded in discrimination. And if these people are willing to employ the shield of religion to cover their discriminatory animus, you could have the government expending enormous sums. Could you not? Your Honor, and if that were to occur, perhaps an as-applied challenge would be in place, and if plaintiffs face a discrimination of the kinds that you're describing. We might not be in a situation here— You're saying it's not a taxpayer challenge. It's not a taxpayer challenge, Your Honor. It's an equal protection challenge. It's a due process potential challenge based on the facts of the specific injury, the kind of injuries that Judge Wilkinson talked about. How would those objections be challenged by somebody who found it impossible, somebody who found themselves unable to marry? That is exactly the type of situation that Senate Bill 2 is trying very hard to avoid. Senate Bill 2, while allowing religious accommodations, at the same time requires that if there is a situation that there is not an agreeing magistrate in the counties, that another magistrate is available. The North Carolina legislature worked very hard to strike the kind of balance that you discussed during the previous portion of the argument and to ensure that this does not occur. One of the things I wonder about here is what the eventual remedy would be. I mean, we would not—we can't—we can't—they're not requesting, if it's a taxpayer challenge to the expenditure of funds, the relief at the end of the road is not to enjoin the particular program or to issue a positive injunction saying that you must perform the marriage ceremony. I mean, that might be another case where you would issue a positive injunction if somebody refused, just adamantly refused. And there was a challenge to that adamant refusal. Then you could enjoin someone, I guess, to perform the marriage. That would be another case, and that would have competing considerations all its own. But the most we can do here, because it's a taxpayer challenge, and what gives the standing is ostensibly, allegedly, the expenditure. The most we could do is to enjoin, not the program, but an administrative expense incidental to the program. And that— That goes into that problem with— I don't think it gets to—I don't think it— I'm just worried that that doesn't get to the real problem because we started enjoining state incidental expenditures, not state appropriations, but state incidental expenditures. And the underlying difficulty, which would still remain. What I think we all would want is for everybody to have a chance to get married under the law of the land, from loving to overspend. That's the law of the land. And we would want people to get married and have the ability to get married according to that law. But the most we can do here under the rubric of this case is to enjoin this incidental expenditure. And I'm just not sure that that gets at the real question. That's my problem. It's not only that it doesn't get it to the real question, but we have a huge redressability problem with the type of standing argument that plaintiffs are proposing here. So the only remedy, Your Honor, under Flast, as you pointed out, is an injunction of unconstitutional spending. So if the court were to agree with plaintiff's argument that the travel expenses of non-recusing magistrates are unconstitutional and would enjoin that spending, marriages in North Carolina are likely to be less available, not more available. This is not the type of injury I would believe that plaintiffs are interested in, but that's the only type of redress available under Flast, and that's where we get into this issue of incompatibility of the type of standing and the type of injury that plaintiffs have here. Another point for which plaintiff's argument of standing must also fail, and Your Honors kind of went through that throughout the plaintiff's part of the argument, is that plaintiff's theory of the case is based on fears that are not connected to traditional establishment clause concerns. And I think Judge Wilkinson talked about that a little bit, that Senate Bill 2 does not require or implicate or even result in the transfer of money from taxpayers through the government treasury into the hands of sectarian entities. And that is the goal that the establishment clause was set to heal. Let me ask you one other question. What difference does it make that this is a state taxpayer suit? Because the classic Flast v. Cohen situation is of a federal taxpayer raising an objection to the expenditure of federal tax dollars to a particular religion. But we're talking about a state taxpayer raising a question about the expenditure of state tax dollars, and given the state's traditional powers over judicial recusals, the way Congress has powers over federal judicial recusals, some of those are statutory, not all, but given the fact that marriage is a traditional state function, along with land use and domestic relations and the rest, to recognize the state taxpayer challenge, could that be viewed by the Supreme Court as a further challenge to the state's authority in an area of traditional state competency? Not that those are not inviolate, because overfill by its very nature was a significant restriction on a state's ability to prohibit any particular kind of marriage. And so is loving, and so are many other instances. But it may be ultimately a question of degree in the sense that, okay, we have the basic command of overfill, but to recognize state taxpayer standing on an implementation matter, would that hit the Supreme Court the wrong way as a dramatic or as a significant extension of the Flass-Becoin decision? Your Honor, I would think so. The trend, as you mentioned, again, during the previous portion of the argument, is to narrow Flass. Wien, Heim, and Kuno all stand for the proposition that the Supreme Court is just chipping away from the Flass standing throughout the time, especially throughout the recent years. What you have with the state, if you add a state component there, state fiscal affairs, state's ability to regulate who performs marriages in North Carolina, you add a federalism aspect to your traditional Article III case or controversy concerns, the type of federalism concern that has not been addressed through Flass. Flass itself talks specifically about federal taxpayers' challenges to congressional exercise of tax and spending powers under Article I, Section 8 of the United States Constitution. Flass was decided after Everson, and yet Everson incorporated the Establishment Clause against the states, but still Flass was confined only to federal taxpayers. So I would agree with your considerations that Supreme Court, if it's presented with this case, may well decide that we are expanding Flass greatly. And in Kuno, in Daimler-Chrysler v. Kuno case, the case that was decided without dissent, the court said we are leaving Flass as is. We are not expanding it. We are not doing anything else with it. So that proposition that Flass should extend to state taxpayers goes both. It goes against the trend towards narrowing, but it also goes into the area of traditional state powers which present a federalism concern. Those state powers are not inviolate. It's correct. By a long way, by a long shot, because the states have done some very bad things with their marriage law. Your Honor, it is correct, but the Supreme Court has also recognized that there is a room for play between the joints of the free exercise clause and establishment clause, where the government may pass regulation that touches upon subject matters of religion without violating either. And Senate Bill 2 falls within that area. The state is doing exactly what it's supposed to do. It tries to comply with Obergefell's mandate, and at the same time, it tries to respect the religious liberty of the North Carolina magistrates. We presented several alternative grounds for the court's consideration if the court disagrees with our main argument that Flass does not give taxpayers standing. We would ask the court to consider those as well. You don't waive those arguments by not bringing them up in oral argument. As long as they're sufficiently covered in your brief. They are covered in our brief, Your Honor, and I would rely on those arguments in our brief. And unless the court has any additional questions, we would ask the court to affirm the lower court's decision on its original ground, and if the court disagrees with the original grounds, also on the alternative grounds we presented. Thank you. All right, we have five minutes. Mr. Dorges, you have some rebuttal time. I do, Your Honor. Let me address a few things. First, I think there's a simple issue here on these last issues. They didn't cross the field on any of these issues, and they can't bring issues up that would have you modify Judge Cogburn's order. And he rejected the state taxpayer standing argument that you just sort of spent time discussing about. He's going to affirm on alternate grounds. I think not if it modifies his order, which is what the Henrico County School case and the Virgin Enterprises case. Well, his judgment was to dismiss, was it not? It was, but if you have to modify the grounds for the judgment, I think under those cases... No, that's not true. You can affirm on an alternate reason that that wouldn't modify the judgment. The reasoning and the judgment and the reasoning are two distinct things. Very well. This does not involve incidental expenses, as that term has been used in the Supreme Court in these cases. Duraimus is where the incidental expense notion came from. And the language in Duraimus is that that allegation did not show the cost of running the schools increased in any amount whatsoever. We are showing here that there are costs that are increasing the procedures for conducting marriages in North Carolina and allowing these judges to recuse themselves. But would there be fewer same-sex marriages if the travel reimbursement, for example, were somehow adjoined? Well, Your Honor, what we would seek to adjoin is the constitutionality of the statute and the spending. If, in fact, the spending were adjoined by a court, the magistrates in the state would have to decide whether they're going to uphold their oath of office or not. And that's what we're asking for. And the spending is the lifeblood of that, Judge, that magistrates should not be able to use a religious point of view to excuse themselves from the oath to uphold the constitution. That's what this case is about, and it's a very fundamental issue. I agree, but what about a case like Hobby Lobby? And, you know, you may disagree with it, and certainly there's room for disagreement with it, but this is not a Supreme Court that is insensitive to claims of religious conscience and free exercise. And as your opposing counsel indicates, there is some play in the joint between the free exercise clause and the establishment clause, and this could... Again, I'm concerned about the high court because this could be viewed quite reasonably by the justices as an attempt on the part of North Carolina here to accommodate free exercise values with establishment clause values. And... We may lose this case on the merits here. But on the pleadings, the issue is whether we have standing to get in the courthouse door based on this spending program that promotes a religious point of view. It's an aid of religion. And the expenditure is not just for the willing magistrate to move to McDowell, it's for the unwilling magistrate to leave McDowell and take over the duties in the other county. So it's supporting that person's religious beliefs to excuse him from a duty. So that's sort of the issue here. Now, in terms of the state taxpayer standing judgment, look at footnote five in the Grand Rapids case, look at footnote four in Marsh v. Chambers. The Supreme Court has already said that state taxpayer standing can be challenged under FLAGS. They proceeded on the premise, but I don't think it's been addressed. No, both footnotes squarely address that state taxpayers can bring FLAGS challenges. Well, whether that's correct, it's been... If this were a state taxpayer challenge, I guarantee you that the federalism aspect of it would be very prominent in any argument on this case before the Supreme Court. So you would want to prepare for that. I would prepare for that, Your Honor. But at this point... You wouldn't just want to cite a footnote from Marsh v. Chambers to do your case. But at this point, this court is bound by the prior decisions of the Supreme Court. And those footnotes, even their footnotes, are decisions that state taxpayers can bring First Amendment challenges. I mean, Everson applied the First Amendment to the state. That's all that these challenges are, are First Amendment challenges to the way the state is operating. And there's really no logical difference between challenging congressional spending and state legislative spending. So I don't think that that's, you know, sort of the whole pantheon of cases leads to allowing people to challenge... state citizens to challenge First Amendment violations in federal court. Well, I'd back up what Judge Kenyon said. As a matter of policy, I'm very sympathetic to where you're coming from. As a matter of law, I think it's very problematic to use this particular taxpayer spending vehicle to try to get at the whole situation. I hope you understand that there's a difference between what judges may or may not favor as a matter of policy and what we do under the requirements of law. And may I close with this, Your Honor? You certainly may. Thank you. This is from Hine, which is the case about the faith-based initiatives under George Bush, which was out of a pot of money that Congress had given to the executive. And the court was not going to take, allow a flat challenge to executive, which is just what flat was completely with fast. But this is what the court said. Because the expenditures that are challenged were not expressly authorized or mandated by any specific congressional enactment. We are challenging the authorization and the mandate to use funds by legislative enactment to accomplish this religious purpose. That fits under Hine. The tiny amount of money that fits under the three-pence principle, the three-pence principle under Wynne. And they both fit under fast. This is, we've identified spending that's traceable back to a legislative enactment in aid of religion. Thank you. Well, I would like to thank you both for your fine arguments. It's much appreciated by the court. And then we will adjourn court and come down and greet everybody.
judges: J. Harvie Wilkinson III, Barbara Milano Keenan, Stephanie D. Thacker